UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PETER HOFFMAN, Regional Director of Region 34 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,<br>   Petitioner,<br><br>  v.<br><br>THE PARKSITE GROUP,<br>   Respondent. | CIVIL ACTION NO.<br>3:08cv1043 (SRU) |

### RULING ON PETITION FOR SECTION 10(j) INJUNCTIVE RELIEF

Petitioner Peter Hoffman, Regional Director of Region 34 of the National Labor Relations Board, seeks injunctive relief pursuant to section 10(j) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 160(j), pending the final disposition of its unfair labor practices suit against respondent, The Parksite Group ("Parksite"), before the National Labor Relations Board. For the reasons that follow, the petition for injunctive relief is granted.

I.  Background

On November 26, 2008, NLRB Administrative Law Judge Raymond P. Green issued his decision in the petitioner's underlying unfair labor practices suit, granting most of the petitioner's requests for relief. According to the petitioner's most recent submission to this court, Parksite has appealed that ruling and, in addition, has refused to comply with the ALJ's order granting injunctive relief. The petitioner, therefore, argues that injunctive relief from this court remains essential, pending the final disposition of its underlying suit.

Where the ALJ has already issued its decision, a federal court reviewing a petition for interim injunctive relief pursuant to section 10(j) of the Act must accord appropriate deference to the ALJ's factual findings. *See Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335-38 (2d Cir.

1999) (per curium) (when reviewing a petition seeking relief pursuant to section 10(j), "[a]n Administrative Law Judge's factual findings are part of the record and cannot be ignored") (internal alteration and quotation omitted); *Hoffman v. Pennant Foods Company*, 2008 WL 1777382, at *6 (D. Conn. 2008) (according deference to ALJ's factual findings when examining petition for section 10(j) injunctive relief). Accordingly, the following facts are drawn from the ALJ's decision and my own independent review of the record submitted with the petition for injunctive relief.

Parksite is an Illinois-based corporation engaged in the wholesale sale and distribution of building materials. Parksite operates at least eight distribution centers, including the presently disputed site in South Windsor, Connecticut (the "South Windsor facility"). Initially, Parksite directly employed the warehouse employees and drivers in South Windsor. In February 2005, however, Parksite contracted with Ryder Integrated Logistics ("Ryder") to outsource those functions. In April 2007, after an election process, the International Brotherhood of Teamsters, Local Union No. 671 ("the union" or "Local 671") became the certified representative of the drivers and warehousemen at the South Windsor. The union and Ryder engaged in collective bargaining talks and reached a collective bargaining agreement in September 2007.

After undertaking an internal review of its outsourcing relationship with Ryder, Parksite decided to terminate its contract with Ryder and bring the warehouse and driving functions back in-house at each of its facilities. In November 2007, Ryder notified the union and the South Windsor employees that Parksite was terminating its contract and would be bringing the positions back in-house as of January 1, 2008.

Rather than rehiring all the former Ryder employees to fill the driver and warehouse

positions, Parksite determined it would open all positions to both internal and outside applicants and advertised the postings online. Although all former Ryder employees were welcome to apply for a position with Parksite, only outside applicants were eligible for a $1,000 signing bonus.

Parksite interviewed 42 people for jobs at the South Windsor facility. Of those, 26 were former Ryder employees and 16 were outside applicants. On December 11, 2007, Parksite made its initial job offers, hiring 14 out of the 26 former Ryder employees[1] and 15 of the 16 outside applicants. Five of those outside applicants subsequently declined Parksite's job offer. By January 2, 2008, there were 25 Parksite employees, 14 of whom were former Ryder employees, making them a majority of the new Parksite workforce.[2] GCx24.

The petitioner alleges that the hiring process was designed to discriminate against union members and to ensure that Parksite ended up with a majority non-union workforce at the South Windsor facility. As support for this position, the petitioner points to the $1,000 hiring bonus advertised only to outside applicants and that outside applicants with lower average interview scores were hired over internal applicants with higher average scores.

On December 19, 2007 and January 18, 2008, the union formally requested recognition as

---

[1] The following is a list of the 12 former Ryder employees who were interviewed, but not offered a position with Parksite: Brian Barber, Michael Beaulieu, Andrew Burleigh, Doug Davis, Benny Ingenito, Steve Lawlor, Arnaldo Martinez, Joe Moyles, Evernard "Robbie" Roberts, Eustaquoi "Jay" Rodriguez, Jack Teske, and Ivan Vasquez.

[2] There is some dispute about the total number of Parksite employees on January 2, 2008. The ALJ's opinion is internally inconsistent because it finds that 14 of the new Parksite employees were former Ryder employees and 10 were outside applicants, but that there were 25 total warehousemen and drivers. ALJ Decision at 7. Parksite only concedes that it did not hire 10 former Ryder employees. Respondent's Response in Opposition to Petition for Injunctive Relief Section 10(j) at 10. Parksite's internal headcount indicates there were 25 Parksite employees, 14 of whom were former Ryder employees, thus constituting a majority of the new workforce as January 2, 2008. GCx24.

the collective bargaining representative for the South Windsor drivers and warehousemen.  In a letter dated January 22, 2008, Parksite declined to recognize the union, stating that it was continuing to interview and hire for those positions at the South Windsor facility.  Parksite further claimed that outside hires constituted a majority of the workforce.[3]

## II.     Discussion

Section 10(j) of the Act permits the NLRB's Regional Director, upon the filing of an unfair labor practices suit before the NLRB, "to petition any district court of the United States . . . for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court . . . thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."  29 U.S.C. § 160(j).  District courts within the Second Circuit employ a two-prong test for determining whether section 10(j) injunctive relief is appropriate.  "First, the court must find reasonable cause to believe that unfair labor practices have been committed.  Second, the court must find that the requested relief is just and proper." *Hoffman v. Inn Credible Caterers, Inc.*, 247 F.3d 360, 364-65 (2d Cir. 2001).  In considering whether to grant the requested section 10(j) relief, "[t]he court need not make a final determination that the conduct in question is an unfair labor practice. It need find only reasonable cause to support such a conclusion. Appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." *Hoffman v. Polycast Tech. Div. of Uniroyal Tech. Corp.*,

---

[3] The letter from Parksite's attorney, Linda Doyle, states that there were 18 employees at the South Windsor location, 12 of whom were former Ryder employees and 15 of whom were not.  GCx11.  The letter's figures are not reliable given its internal inconsistency.  Examining Parksite's headcount for the South Windsor site, it appears that, on January 22, 2008, there were 23 workers, 13 of whom were former Ryder employees and 10 of whom were not.  GCx24.

79 F.3d 331, 333 (2d Cir. 1996) (quoting *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995) (internal quotation omitted)).

  A. <u>Reasonable Cause</u>

  The petitioner alleges that Parksite engaged in, and continues to engage, actionable unfair labor practices by: (1) refusing to recognize and collectively bargain with the union after it assumed the warehouse and distribution functions at the South Windsor facility; (2) refusing to hire ten former Ryder employees because of their involvement with union activities; (3) interrogating employees about their union activities during the interview process; (4) changing the terms and conditions of employment at the South Windsor facility without notifying the union and permitting it to bargain over those changes; and (5) interfering, restraining, or coercing employees in the exercise of their rights guaranteed by section 7 of the Act, 29 U.S.C. § 157.[4]

  When determining whether there is reasonable cause to believe that Parksite committed unfair labor practices, I must give the petitioner's legal and factual theories "considerable deference." *Inn Credible Caterers*, 247 F.3d at 365. Specifically, I must give the petitioner's version of the facts "the benefit of the doubt" and should sustain the petitioner's legal theory unless I am "convinced it is wrong." *Id.* (quoting *Kaynard v. Palby Lingerie, Inc.* 625 F.2d 1047, 1051 (2d Cir. 1980)); *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1031 (2d Cir. 1980) (noting that, for purposes of analyzing whether "reasonable cause" exists, "the Regional Director's version of

---

[4] 29 U.S.C. § 157 states in full: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

the facts should be sustained if within the range of rationality" and "inferences from the facts should be drawn in favor of the charging party").

Because the union's collective bargaining agreement was with Ryder and not Parksite, the question whether Parksite had the obligation to bargain with the union in the first place turns on the question of legal successorship.  *See Inn Credible Caterers*, 247 F.3d at 365.  "Legal successors are under an obligation to recognize and to negotiate with the predecessor union;" the failure to do so constitutes an unfair labor practice.  *Id.*; *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41 (1987) (holding that a new employer has an obligation to bargain with the union so long as it is a "successor" of the previous employer and it employs a majority of the predecessor's employees).  Therefore, in order for Parksite to have committed an unfair labor practice by refusing to recognize and bargain with Local 671, there must be reasonable cause to believe that Parksite was Ryder's legal successor at the South Windsor facility.

Determining whether there is "legal successorship" requires a two-part inquiry: (1) there must be "substantial continuity" between the businesses of the first and second employers, and (2) "the successor must have hired a majority of the predecessor's employees at the time when the successor's workforce had reached a 'substantial and representative complement.'"  *Id.* (quoting *Fall River Dyeing*, 482 U.S. at 43, 47).  If both prongs are met, the successor employer will be deemed legally obligated to bargain with the predecessor union.  *Id.*

       1.    *Substantial Continuity*

Whether "substantial continuity" exists between the two enterprises is a fact-based, totality of the circumstances inquiry, conducted from the perspective of the employee.  *Id.* at 366.  Pertinent factors for consideration include: "'whether the business of both employers is

essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.'" *Id.* (quoting *Fall River Dyeing*, 482 U.S. at 43).

There is considerable evidence in the record to support a finding of substantial continuity in this case. First, until 2005 when it outsourced the warehousing and driving functions at the South Windsor facility to Ryder, Parksite directly employed those workers. Thus, Parksite's decision to bring the logistics functions at South Windsor in-house can be best described as a reversion back to its traditional business model, rather than a new direction for the company. Second, the evidence in the record supports the finding that the business operations have remained wholly intact since Parksite's assumption of control in January 2008. There is no indication in the record that, beyond cutting one or two positions, the South Windsor employees have been operating under different working conditions or performing different sorts of tasks than they did under Ryder. Finally, in its own publications to the Ryder employees regarding the transition and in its online job postings, Parksite expressed a need to fill the same positions performed by Ryder employees. For example, in its "FAQ: Ryder/Kenco-Parksite Transition" handout distributed to the South Windsor Ryder employees, Parksite stated that efficiency was the primary reason behind the transition and that "[t]he same work needs to be accomplished to complete warehousing, loading, and delivery of inventory to customers." GCx7 at 2. Parksite's online posting for "Truck Driver – CDL Class A" on CareerBuilder.com states that the "job will primarily consist of local vehicle operations involving positioning and moving trucks and trailers on Parksite and customer locations to effect loading and unloading, respectively." GCx26 at 1-2.

Thus, there is, at a minimum, reasonable cause to believe there was "substantial continuity" between Parksite's and Ryder's operations at the South Windsor facility.

### 2. *Substantial and Representative Complement*

The second part of the legal successorship inquiry relates to the pertinent time period for analyzing the composition of the successor employer's workforce. *Inn Credible Caterers*, 247 F.3d at 366. A court must determine whether the successor employer has hired a majority of the predecessor's employees at the point in time that it has achieved a "substantial and representative complement" of its employees. *Id.* "If, at this particular moment, a majority of the successor's employees had been employed by its predecessor, then the successor has an obligation to bargain with the union that represented these employees." *Fall River Dyeing*, 482 U.S. at 47.

Like the substantial continuity analysis, the substantial and representative complement prong requires a fact-intensive inquiry. Key factors include: "'whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production . . . [and] the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work . . . as well as the relative certainty of the employer's expected expansion.'" *Inn Credible Caterers*, 247 F.3d at 366 (quoting *Fall River Dyeing*, 482 U.S. at 49).

The parties dispute when Parksite achieved its substantial and representative complement of workers. The petitioner contends that the pertinent date for calculating the composition of workers is January 1 or 2, 2008. In its January 22, 2008 letter refusing to recognize the union, Parksite contended it was not obligated to bargain with Local 671 because it had not completed its hiring process and because a majority of its workers were not former Ryder employees.

GCx11. The employment figures cited in that letter are disputed and contradicted by other evidence in the record.

Based on my review of the record, it appears that the warehousing and driving workforce at the South Windsor site hovered between 26 and 29 employees from June 2006 to July 2008. At the June 8, 2006 vote on whether to unionize, according to the official tally of ballots, there were 29 "eligible voters" at the South Windsor facility. GCx2d. At the April 5, 2007 vote, there were 26 eligible voters. GCx2i. Those figures represent a reasonable approximation of the number of employees at the South Windsor facility because, as defined by the Ryder-Local 671 stipulated election agreement, "eligible voters" are defined as those "unit employees employed during the designated payroll period for eligibility, including employees who did not work during that period because they were ill, on vacation, or were temporarily laid off." GCx2b at 1. As stated in Parksite's internal headcount of South Windsor employees, there were 27 logistics employees as of July 15, 2008. GCx24. Therefore, throughout the relevant timeframe, the South Windsor facility operated with between 26 and 29 employees.

Parksite officially assumed the logistics operations at South Windsor from Ryder on January 1, 2008. As of January 2, 2008, Parksite employed 25 truck drivers and warehousemen. Although 25 workers is less than the number of workers employed by Ryder, it is certainly high enough to find that Parksite had commenced substantially normal operations by that date. Because the total workforce only grew by two more workers over the subsequent seven months, there is reasonable cause to believe that, as of January 2, 2008, Parksite had reached the requisite substantial and representative complement of workers.

As of January 2, 2008, Parksite employed a majority of former Ryder employees: 14

former Ryder employees and 11 non-Ryder employees, for a total of 25 workers.[5]  GCx24.

Thus, using January 2, 2008 as the relevant date for determining whether Parksite had employed a majority of former Ryder employees, there is reasonable cause to believe that Parksite had an obligation to recognize and bargain with the union as a legal successor to Ryder, and that its failure to do so constitutes an unfair labor practice.

B.      Just and Proper

Having determined there is reasonable cause to believe Parksite committed unfair labor practices, it is necessary to determine whether the petitioner's requested temporary relief is "just and proper."  Specifically, the petitioner seeks an order enjoining Parksite from refusing to recognize the union, refusing to hire employees based on their union activities, interrogating employees about their union activities, changing their terms of employment without first consulting Local 671, and interfering with the employees' rights under section 7 of the Act.  The petitioner further seeks an order requiring Parksite to recognize the union, offer employment to the ten former Ryder employees who were not initially hired, rescind any and all post-January 1, 2008 changes to the employment terms, and post copies of this court's order at the South Windsor facility.

In the Second Circuit, section 10(j) is deemed to be just and proper "when it is necessary to prevent irreparable harm or to preserve the status quo."  *Inn Credible Caterers*, 247 F.3d at

---

[5] The former Ryder employees working for Parksite on January 2, 2008 were as follows: Richard Barrows, Jr., Erich Beulig, Harold Clark, Jose Colon, Lawrence Decarti, Jeffrey Ogren, Scott Rossi, John Saya, Victor Soto, John Degray, Dwayne Phillips, Steven Potter, Jonathan Ruggles, and Daniel Storrs.  GCx24.  The outside hires were as follows: Shelton Eason, James Scruggs, Earl Brown, Latoya Cunningham, Erik Hamm, Chaz Harris, Cedric Lanier, Manuel Padilla, Karl Pulaski, Theordore Vancour, and Robert Zigmond.  *Id.*

368.  "[T]he appropriate test for whether harm is irreparable in the context of § 10(j) successorship cases is whether the employees' collective bargaining rights may be undermined by the successor's unfair labor practices and whether any further delay may impair or undermine such bargaining in the future."  *Id.* at 369.  In legal successorship cases in particular, there is a "pressing need to preserve the status quo" pending the outcome of the underlying unfair labor practices case in light of the damage that the successor's mere refusal to recognize and bargain with the predecessor union can have on employees' confidence in that union.  *Id.*  "Without such preservation, [the final] determination of any violations will be meaningless in the context of a new majority workforce committed to non-unionization."  *Id.*  The pertinent "status quo" that must be preserved or restored is that which existed before the successor employer committed the alleged unfair labor practices.  *Id.*; *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975).

It is plain from the circumstances of this case that the requested relief is just and proper because it is necessary for restoring the pertinent status quo and preventing further irreparable harm to the employees' collective bargaining rights pending the final outcome of the petitioner's unfair labor practices suit.  Parksite's ongoing failure to recognize the union as the South Windsor employees' collective bargaining representative could significantly damage employee confidence in the union and chill any effort to exercise their collective bargaining rights in the future.  *See Inn Credible Caterers*, 247 F.3d at 369 (concluding that, in the absence of an injunction, the employer could continue to hire non-union workers and "thereby threaten to weaken severely, if not destroy, the power of the predecessor's employees to assert their collective bargaining rights).

Similarly, an order for reinstatement of the ten former Ryder employees is necessary to restore the status quo prior to Parksite's refusal to recognize and bargain with Local 671. There is reasonable cause to believe that Parksite actively sought to dilute the number of union-represented workers in order to avoid its obligation, as a legal successor to Ryder, to recognize and bargain with the union. Not only is the timing of the transition suspicious, considering Parksite decided to move the logistics division back in-house less than two months after Ryder reached a collective bargaining agreement with the union, but it appears that Parksite was consciously attempting to achieve a majority non-union workforce based on the composition of its initial job offers in December 2007. It initially offered jobs to 15 outside applicants and 14 Ryder employees. But for the decision by some of those outside applicants to decline their offer, Parksite would have had a majority non-union workforce at the time it commenced operations on January 2, 2008. Therefore, requiring Parksite to offer those ten employees employment would reverse, or at least freeze, its efforts to undermine the union's collective bargaining efforts at the South Windsor facility. Failure to order reinstatement would undermine employee confidence in the union's ability to protect their rights under the collective bargaining agreement and would further encourage Parksite to engage in unfair labor practices aimed at diluting union support, such as hiring more non-union workers. *See Pennant Foods*, 2008 WL 1777382, at *8 (holding that reinstatement of a union employee was necessary to "prevent any chilling effect on employee support for the Union"); *Blyer v. P & W Electric, Inc.*, 141 F. Supp. 2d 326, 330 (E.D.N.Y. 2001) (holding that, absent reinstatement of union workers, there was a risk that union's organizational efforts would be chilled, if not destroyed).

Finally, the fact that the the ALJ has already rendered his decision, finding in favor of the

petitioner and ordering the requested injunctive relief and reinstatement of the ten former Ryder employees, further necessitates interim relief. According to the petitioner's latest filing, Parksite has refused to comply with that decision, pending its appeal. Therefore, in the absence of interim relief by this court, it could be many more months before Parksite complies with the ALJ's directives, should that decision be affirmed on appeal. Any further delay could exacerbate the damage caused by Parksite's unfair labor practices.

Parksite's opposition to the requested relief centers primarily on the petitioner's delay in seeking section 10(j) relief, that an order by this court is unnecessary in light of an anticipated ruling by the ALJ, and that an injunction would cause irreparable harm to Parksite and its current employees.

Parksite's argument that petitioner's request for relief should be denied on the basis of "unreasonable" delay is without merit. Both the union and the petitioner have consistently pursued unfair labor practices claims against Parksite since it initially refused to recognize Local 671 as the collective bargaining representative for South Windsor on January 22, 2008. The union filed its initial charge on January 29, 2008, which was amended on March 19, 2008. After the charge was referred to the petitioner, it issued its administrative complaint against Parksite on May 30, 2008 and filed the pending petition for section 10(j) injunctive relief on July 14, 2008. I held a show cause hearing on the petition on October 1, 2008, with final briefing submitted on October 9, 2008. The ALJ heard evidence at a hearing held August 19-22, 2008 and September 15, 2008. He issued his decision on November 26, 2008, which granted the petitioner's request for relief in the underlying unfair labor practices suit. Certainly every case takes time to research and prepare; the timeline presented here is not unusually long or dilatory. Accordingly, there is

no basis upon which I can conclude that petitioner has not diligently pursued its claims against Parksite at both the administrative and district court level.

Parksite's next argument, that this court should wait for the ALJ to render his decision, is moot because the ALJ has recently issued his decision, finding in favor of the petitioner. According to the petitioner's most recent filing, Parksite has refused to abide by the ALJ's order, thus making section 10(j) injunctive relief to preserve and restore the relevant status quo all the *more* pressing, not less.

Finally, on the issue that an order requiring reinstatement of former Ryder employees would cause irreparable harm to Parksite and its current employees, I recognize that such an order might cause some hardship for those displaced employees. The equities, however, weigh in favor of protecting the pre-January 2008 status quo to prevent irreparable harm to the former Ryder employees' ability to exercise their collective bargaining rights and to prevent Parksite's conduct from undermining support for the union among the South Windsor workforce.

**III.     Conclusion**

For the foregoing reasons, the petition for section 10(j) injunctive relief (**doc. #1**) is **GRANTED**. Parksite shall report back to this court within fourteen (14) days to confirm its compliance with the injunction order, which will issue separately. The petitioner's motions for expedited decision (**docs. #25 and #27**) are **DENIED as moot**.

It is so ordered.

Dated at Bridgeport, Connecticut, this 16th day of January 2009.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge